UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

HOWARD SCOTT BASSUK

      Debtor.
_____/

FORD MOTOR COMPANY,

    Plaintiff,

vs.

HOWARD SCOTT BASSUK

    Debtor/Defendant.
_____/

Case No.: 6:17-bk-04478-RAC
Chapter 7

Adv. Proc. No.:

**COMPLAINT TO EXCEPT DEBT FROM DISCHARGE (11 U.S.C. § 523)**
**AND TO DENY GLOBAL DISCHARGE (11 U.S.C. § 727)**

FORD MOTOR COMPANY (hereinafter "Ford"), by and through its undersigned attorneys, files this adversary proceeding pursuant to 11 U.S.C. §§ 523, and 727, seeking an order determining the debt owed to Ford by Defendant Howard Scott Bassuk ("Defendant" or Bassuk") is excepted from discharge, and to deny the discharge, and states:

**PARTIES, JURISDICTION AND VENUE**

1.    The Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code on July 5, 2017 (the "Bankruptcy Case").

2.    The Bankruptcy Case was assigned Case No.: 6:17-bk-04478-RAC.

3. The Bankruptcy Case is pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§157 and 1334 and 11 U.S.C. §§ 523 and 727. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and 157(b)(2)(J).

4. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1409(a) and other applicable law

5. This adversary proceeding arises in and is related to the Bankruptcy Case.

6. Ford is a creditor of the Debtor.

## GENERAL ALLEGATIONS

7. Ford designs and manufactures new motor vehicles bearing the Ford and Lincoln brand names.

8. At all times material hereto, Bassuk was a principal of and President of MAD Enterprise Group, LLC ("MAD Enterprises") with authority to bind the company.

9. At all times material hereto, Bassuk and MAD Enterprises represented to Ford that MAD Enterprises was in the business of providing luxury vehicles to resorts, casinos, and hotels for the use of their guests. In fact, Bassuk and MAD Enterprises were vehicle brokers and exporters.

10. Ford offers incentive programs to qualified individuals and businesses to, among other things, encourage high-volume purchases of Ford vehicles from its dealers.

11. One such incentive program is Ford's Competitive Price Allowance program ("CPA Program"). Through the CPA Program, Ford provides discounts or credits to qualified high-volume purchasers and lessees of Ford vehicles through the Ford Fleet Program.

12. The purpose of the CPA Program is to allow high-volume Ford and Lincoln purchasers to be offered competitive pricing and promote the selection of Ford Motor Company products domestically.

13. On or about February 3, 2011, Bassuk met with Ford employee Wayne Boor and represented that he was in the business of managing a fleet of vehicles used by resorts to transport customers.

14. After that meeting, Bassuk obtained a Fleet Identification Number (FIN), gained access to the CPA Program, and began ordering Ford vehicles.

15. In or around August 2013, Wayne Boor spoke extensively with Bassuk regarding the prohibition on the exportation of Ford vehicles purchased through the CPA Program. Bassuk vehemently denied purchasing vehicles for export.

16. On or about January 1, 2014, Bassuk formed MAD Enterprises.

17. MAD Enterprises, through Bassuk, entered into the Competitive Price Allowance Program Terms and Conditions ("CPA Agreement") with Ford in 2014 and 2015.

18. On or around December 3, 2014, Bassuk told Ford employee Craig Fetty that MAD Enterprises was in the business of providing transport vehicles for specialty events, resorts, and similar customers. This was consistent with what he had previously reported to Wayne Boor.

19. In or around April 2015, Bassuk met with Richard Rosenberg and Linda Rakestraw, employees of Sun State Ford, Inc. ("Sun State Ford"), an independent Ford dealership in Orlando, Florida. At that meeting, Bassuk reported the same business model to the Sun State Ford Employees.

20. On August 7, 2015, Amy Bui, a MAD Enterprises employee, at Bassuk's direction, emailed to Richard Rosenberg an alleged contract between MAD Enterprises and a New York property management company for the lease of vehicles. This email was aimed at providing support for MAD Enterprises' alleged business model.

21. Based upon information and belief, the contract supplied by MAD Enterprises was fraudulent.

22. Neither Bassuk nor MAD Enterprises was in the business of maintaining fleet vehicles for resorts, property management groups, special events, or any similar client.

23. At all material times Bassuk and MAD Enterprises were in the business of brokering and exporting vehicles.

24. Pursuant to the CPA Agreement, Bassuk and MAD Enterprises agreed that, to be eligible for any discounts, the purchased vehicles must be operated and registered only in the United States, and could not be exported. Specifically the contract states:

   a. "Vehicles must be registered solely in the United States and must operate in the United States."

   b. "Vehicles must be registered and operated solely in the 50 United States."

   c. "Customers who violate the minimum in-service requirements may be subject to fleet incentive chargeback and/or cancellation of their FIN code."

25. From 2014 through 2016, Bassuk and MAD Enterprises purchased over 970 vehicles under the CPA Agreement. All of those vehicles were discounted by Ford pursuant to the terms of the CPA Agreement.

26. Ford became aware that many of the vehicles sold to Bassuk and MAD Enterprises under the CPA Agreement were exported to China immediately upon purchase in violation of the CPA Agreement.

27. Pursuant to the CPA Agreement, MAD Enterprises received discounts from Ford totaling over $2,758,252.00 for vehicles purchased from its franchised dealers, including Sun State Ford.

### FORD'S LAWSUIT AGAINST BASSUK AND MAD ENTERPRISES

28. On July 25, 2016, Ford filed a Complaint against Bassuk and MAD Enterprises in the United States District Court, Middle District of Florida, styled *Ford Motor Company v. MAD Enterprise Group, LLC b/d/a MAD Enterprises Group, LLC, a Florida Corporation and Howard Scott Bassuk, individually*, No. 16-cv-01333-PGB-TBS.

29. On December 20, 2016, Ford filed an Amended Complaint, which is the operative Complaint in that case. The Federal Court case has been stayed upon Bassuk's filing of the Bankruptcy Case.

### BASSUK'S FALSE STATEMENTS AND FAILURE TO PROVIDE INFORMATION IN THE BANKRUPTCY CASE

30. In connection with the Bankruptcy Case, Bassuk has made numerous false statements on his petition and the attached forms including the Schedules and Statement of Affairs and in his testimony during his several meetings of creditors and 2004 examinations.

31. Bassuk has consistently failed to produce records requested by the Chapter 7 Trustee, Robert Thomas, and the creditors, which failure has caused the 341 meeting to be continued several times.

32. The 341 meeting was never concluded because Bassuk, and his counsel, failed to attend the last two scheduled 341 meetings, causing the Trustee to file a motion to dismiss the case.

33. Bassuk has failed to produce any of his personal tax returns during the course of the Bankruptcy Case.

34. At his August 15, 2017, meeting of creditors he testified that a CPA filed his 2015 tax returns but no longer had record of the filing, and that he spoke with the IRS, which confirmed it had been filed and would be mailed out within 20 days.

35. At his September 26, 2017, meeting of creditors he testified that "one of the girls in [his] office" filed his personal tax returns in 2015.

36. At the same meeting, he testified he was having a "local guy" file his 2016 tax returns and would provide those in a couple of weeks.

37. Yet, at that very same meeting, he testified that he had a "fall out" with the CPA who filed his 2015 tax returns. Bassuk testified that he then requested the returns from the IRS, but the IRS sent them to the incorrect address.

38. He also testified that he had his personal tax returns for 2012, 2013, and 2014, which he could provide.

39. However, at the 2004 examination conducted on November 29, 2017, he testified that he could not say with any certainty that any of his recent personal tax returns were filed with the IRS. He estimated it was 2011 that he last filed returns. He repeated several times he was "done" answering questions regarding his personal tax returns because he had no information about them.

6

40. Despite his testimony at his prior meetings of creditors that he had been attempting to secure his tax returns, at the November 29th examination he testified that "Literally, just within the last week [he] started" contacting the IRS and his alleged CPA.

41. Bassuk's Petition, Schedules, and Statement of Affairs contain numerous false and misleading statements.On the Petition, in Part 1, question 4, Bassuk stated he had not used any business names in the last 8 years. He did not disclose MAD Enterprises or any of his prior businesses.

42. On the Petition, in Part 1, question 5, Bassuk stated he resided at 13328 Bellaria Circle, Windermere, Florida 34786. In fact, Bassuk no longer resided at that address.

43. On his Schedules, on Schedule B, question 6, Bassuk valued the contents of his marital home at $60,000 in assets. However, Bassuk voluntarily transferred all items in his marital home to his wife on June 9, 2017 – one month prior to filing bankruptcy.

44. On his Schedules, on Schedule B, question 8 and 10, Bassuk stated he did not own any artwork or firearms, yet testified later that he did possess a firearm.

45. Bassuk has testified that prior to the Petition he transferred certain artwork, jewelry and firearms to his wife.

46. He testified at his August 15, 2017, and September 26, 2017 Meetings of Creditors that he did not own any artwork. However, he testified at his November 29, 2017, examination that artwork he inherited from his father was still in the home and had been transferred to his wife.

47. At the time of filing bankruptcy, Bassuk was also in possession of an additional handgun that had allegedly been given to him in May or June 2016, which he did not disclose. At

his November 29, 2017, examination he refused to disclose the name of the friend who allegedly gave him the handgun.

48. On his Schedule I, Bassuk stated he earned $4,000 per month as a consultant and was self-employed. He failed to provide the name of an employer but also stated he did not own a business. He indicated he had been employed in that capacity for two months.

49. Despite his above assertions that he had earned $4,000 per month for two months, on his Statement of Financial Affairs, he stated that his total income for 2017 (which should be from January 1 through the Petition date) was $4,000. Confusingly, on his official Form 122A-1 the Chapter 7 Statement of Current Monthly Income, filed the same day, he stated his income was $666.67 per month.

50. On his Statement of Financial Affairs, he stated that he earned $0.00 in 2016 and $240,000 in 2015. At his November 29, 2017, examination in this matter, he again testified that he did not earn any income in the year 2016.

51. MAD Enterprises' bank records for the first two months of 2016 – the only two months discovered to date – show that Bassuk paid himself salary during both of those months in 2016. Therefore, he had income in the year 2016 which was not properly disclosed.

52. At the same examination, he also admitted that his reported $240,000 income for 2015 was merely an estimate and his actual income may have been more or less than that amount

53. At his meeting of creditors, Bassuk stated he would provide the trustee with documentation of his current income; however, he has failed to do so.

54. On his Statement of Affairs, Bassuk also stated that he did not receive any other income in the two years prior to filing bankruptcy. However, he admitted during his examination

that he used MAD Enterprises' bank account to pay his bills or purchase personal items, which was a form of compensation in addition to his salary.

55. On the Statement of Financial Affairs, Bassuk did not disclose all transfers of property within two years prior to filing bankruptcy. Contrary to his disclosure, he transferred nearly all of his personal property to his wife the month prior to filing bankruptcy. At his August 15, 2-17 meeting of creditors he testified that he also sold an Audemars Piguer Royal Oak Offshore Chronograph watch prior to filing bankruptcy.

56. In part 8 of the Statement of Financial Affairs, Bassuk stated he did not sell, close, or transfer any bank accounts in the one-year prior to filing bankruptcy. However, he has failed to provide any bank account records prior to 2017 and admitted at his October 11, 2017, examination that he has made no effort to secure such records.

57. In Part 11 of the Statement of Financial Affairs, Bassuk stated he was a member of an LLC but then also stated he was not a member of any business. Consequently, he did not disclose any business interests, although he owned at least two businesses in the four years prior to filing bankruptcy, including MAD Enterprises, and AJB Capital Group.

### COUNT I - FORD'S CLAIMS AGAINST BASSUK ARE NON-DISCHARGEABLE PURSUANT TO 11 U.S.C § 523(a)(2)(A)

58. This is an action pursuant to 11 U.S.C. § 523(a)(2)(A) to determine that Ford's claims against the Debtor are not dischargeable because the Debtor obtained money, property, or services from Ford by false pretenses, false representations, or actual fraud.

59. Ford incorporates by reference the allegations contained in paragraphs 1 through 29 above.

60. The Debtor falsely and fraudulently represented to Ford that the vehicles purchased from Ford pursuant to the CPA would be registered and operated within the United States.

61. The Debtor falsely and fraudulently represented that MAD Enterprises was in the business of supplying vehicles to domestic resorts, hotels, and casinos.

62. The Debtor knew at all times that he was acquiring the vehicles in violation of the CPA and in contrary to his representations to the Ford representatives, and that his representations were false.

63. Ford relied on the Debtor's representations and sold the vehicles to the Debtor in accordance with the CPA and provided discounts under the CPA in reliance of the Debtor's representations.

64. The Debtor benefitted from the receipt of the discounts provided by Ford pursuant to the CPA.

65. Section 523(a)(2) provides that an individual debtor will not be discharged from any debt obtained by "false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

66. The debt owed to Ford by Bassuk was entirely obtained through false pretenses, false representations, and actual fraud.

WHEREFORE, Ford respectfully requests the Court enter a judgment against the Debtor determining that Ford's claims against the Debtor are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A); awarding Ford a judgment against the Debtor; and for such other and further relief as is necessary and just.

## COUNT II – BASSUK IS NOT ENTITLED TO A DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(2)

67. This is an action pursuant to 11 U.S.C. § 727(a)(2) to determine that the Debtor is not entitled to a discharge because he has transferred or concealed his property within one year prior to filing the Bankruptcy Case.

68. Ford incorporates by reference the allegations contained in paragraphs 1 through 57 above.

69. 11 U.S.C. § 727(a)(2) states that debt will not be discharged if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition

70. Bassuk has both misrepresented and concealed his prior and current income by failing to provide any documentation regarding his 2014, 2015, 2016, or 2017 income during this Bankruptcy Case.

71. He has made inconsistent statements regarding the whereabouts of his personal and business tax returns, has admitted to making no effort to obtain his prior bank statements, and has not provided any documentation regarding his current income.

72. Additionally, one month prior to filing bankruptcy, Bassuk transferred to his wife personal property which he has valued at $60,000.00.

WHEREFORE, Ford respectfully requests the Court enter an order denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2); and for such other relief as is necessary and just

### COUNT III – BASSUK IS NOT ENTITLED TO A DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(3)

73. This is an action pursuant to 11 U.S.C. § 727(a)(3) because the Debtor has failed to keep or preserve documents and financial information from which the Debtor's financial condition or business transactions might be ascertained.

74. Ford incorporates by reference the allegations contained in paragraphs 1 through 57 above.

75. 11 U.S.C. § 727(a)(3) states that debt will not be discharged if the debtor has concealed, falsified, or failed to preserve any recorded information, documents, records, or papers from which the debtor's financial condition or business transactions might be ascertained.

76. Bassuk has concealed his prior and current income by failing to provide any documentation regarding his 2014, 2015, 2016, or 2017 income during the Bankruptcy Case.

77. He has made inconsistent statements regarding the whereabouts of his personal and business tax returns, has admitted to making no effort to obtain his prior bank statements, and has failed to provide any documentation regarding his current income.

WHEREFORE, Ford respectfully requests the Court enter an order denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3); and for such other relief as is necessary and just.

### COUNT IV – BASSUK IS NOT ENTITLED TO A DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(4)

78. This is an action pursuant to 11 U.S.C. § 727(a)(4) to determine that the Debtor is not entitled to a discharge because he knowingly and fraudulently made a false oath or account in the Bankruptcy Case.

79. Ford incorporates by reference the allegations contained in paragraphs 1 through 57 above.

80. 11 U.S.C. § 727(a)(4) states that debt will not be discharged if the debtor knowingly and fraudulently in connection with the case made a false oath or account.

81. The prior allegations show that Bassuk has made multiple false statements on his Petition, Schedules, Statement of Affairs and related forms, and has made numerous false and inconsistent statements in his testimony regarding his assets, his income, and his financial records. These statements were made knowingly and fraudulently in this case.

WHEREFORE, Ford respectfully requests the Court enter an order denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4); and for such other relief as is necessary and just.

Dated: December 15, 2017.

> */s/ M. Gary Toole*
> M. GARY TOOLE
> Florida Bar No. 710814
> JOHN R. REID, JR.Florida Bar No. 0002674
> COLBY NICOLE FERRIS
> Florida Bar No. 8416
> MCDONALD TOOLE WIGGINS, P.A.
> 111 N. Magnolia Avenue, Suite 1200
> Orlando, FL  32801
> Telephone: (407) 246-1800
> Facsimile: (407) 246-1895
> Primary Service Email: gtoole@mtwlegal.com
> Secondary Service Email: e.service@mtwlegal.com
>
> And

*s/ Bradley M. Saxton*
Bradley M. Saxton, Esquire
Florida Bar No.: 0855995
bsaxton@whww.com
**W**INDERWEEDLE, **H**AINES, **W**ARD
 & **W**OODMAN, **P.A.**
PO Box 880
Winter Park, Florida 32790-0880
Telephone: (407) 423-4246
Fax: (407) 645-3728
Attorneys for Ford Motor Company